Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on September 11, 1996, and at the hearing as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Helmsman Management Service as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The issue for determination is whether the plaintiff's left hand problems are compensable, and if so, to what benefits may she be entitled under the Act.
5. The parties stipulated the following exhibits into the record:
 a. Employer Investigation Report, October 25, 1995, two pages;
 b. Seven pages of Commission documents, including a Form 18, 19, 33R and letter; and,
 c. Seventeen pages of medical records of Dr. Mark McGinnis.
 *********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was employed as a glue line operator with defendant-employer in September of 1984. Her duties included assembling foam rubber and fortrel fiber pads into furniture cushions.
2. The gluing job required the plaintiff to assemble 200 to 300 cushions per eight-hour day. The plaintiff would spray glue with her right hand over foam pieces using a sweeping motion, and then would use both hands to press foam rubber together. The process would be repeated to attach another foam rubber piece, and she would then have to pinch along the edges with her first and long fingers and thumb of both hands. The cushion would then be flipped and the entire process repeated. The plaintiff used the left hand to hold the cushion and the right hand to spray the glue.
3. Prior to October, 1995, the plaintiff had pre-existing carpal tunnel syndrome for which she had two surgeries approximately eight years prior while working for defendant-employer, one by Dr. Stanley Peters (right carpal tunnel release in 1992) and one by Dr. John de Perczel (left carpal tunnel release in 1990). The plaintiff was never assigned a permanency rating as a result of this condition, and these surgeries were never filed as workers' compensation claims.
4. On October 13, 1995, while performing her regular job, the plaintiff experienced an episode of loss of strength and pain in her left hand, following which the hand went limp. The plaintiff reported this episode to her supervisor and an investigation was done.
5. On October 23, 1995, the plaintiff was referred by her employer to Dr. Mark R. McGinnis for treatment, at which time, she was diagnosed with left de Quervain's tenosynovitis (which resolved itself within a month in response to medication) and left thumb carpometacarpal joint arthritis. Injections were given for these conditions, and the plaintiff continued to work during this time.
6. After the plaintiff's left thumb carpometacarpal joint arthritis symptoms did not improve, she underwent left thumb joint resection arthroplasty with tendon interposition on January 4, 1996, by Dr. McGinnis, who also discussed with plaintiff the possibility of surgery on the right hand. The plaintiff was initially authorized to remain out of work from January 4, 1996 through April 15, 1996; but she was not released to light duty work until May 13, 1996 with instructions to work four hours a day for two weeks and thereafter six hours a day for two weeks, before resuming a regular eight-hour day job.
7. Thereafter, the plaintiff continued to have sporadic numbness in both hands, sporadic pain in both hands, difficulty sleeping at night, and, in particular, experienced pain while doing her glue-line job.
8. Dr. E. Brown Crosby saw the plaintiff September 5, 1996. He noted that she was a 61-year-old, right-handed female, who had been working for Hickory Springs for approximately 12 years. Plaintiff conveyed to Dr. Crosby a history of lifting cushions on October 13, 1995, while at work and experiencing a sudden onset of pain in her left thumb base. She reported that she had not had any prior injury or problems with her left hand other than a left trigger-thumb release operation by Dr. Schulten, although, as she also reported to Dr. Crosby, she had in the past undergone carpal tunnel releases on each hand.
9. Dr. E. Brown Crosby diagnosed plaintiff's left hand as exhibiting post arthroplasty of her left thumb base, causing painful osteoarthritis at the left thumb base, a condition of joint space compromise, most typically at the base of the thumb at a first carpometacarpal joint — basically a wearing away of the cartilage to the point of potentially having a bone on bone — which is painful and disabling, resulting in weakness and chronic pain.
10. Dr. E. Brown Crosby opined that plaintiff's condition could either have been caused, or aggravated by repetitive use of the hands at work; and, that the glue-line job that plaintiff did could, or might have caused aggravation of plaintiff's pre-existing arthritic problems. In addition to considering his examination of plaintiff and a detailed and accurate description of plaintiff's job duties presented to him by plaintiff's attorney in a hypothetical question during deposition, Dr. Crosby also relied upon a videotape of some of the motions involved in plaintiff's work in rendering his opinions.
11. Dr. Crosby further opined that plaintiff's job duties with defendant-employer placed her at an increased risk of developing de Quervain's tenosynovitis and left thumb carpometacarpal joint arthritis, or aggravating a pre-existing condition than members of the general population.
12. After finding on September 5, 1996, that the plaintiff was at a point of maximum medical improvement, Dr. Crosby assigned plaintiff a permanent partial disability rating in the left hand of 15 percent and a permanent partial disability rating in the right hand of 20 percent. Dr. Crosby also opined that plaintiff is likely to have difficulty tolerating any work involving repetitive use of her hands.
13. Pursuant to Stipulation 4 above, the only issue for determination herein is whether the plaintiff's left hand problems are compensable, and if so, to what benefits is she entitled under the Act.
14. Based upon the competent evidence in the record, plaintiff's glue-line job duties either caused, or materially aggravated her pre-existing arthritic condition of the left hand and placed her at an increased risk of developing de Quervain's tenosynovitis and left thumb carpometacarpal joint arthritis, or of materially aggravating these pre-existing conditions over members of the general population.
15. Plaintiff has proven by the greater weight of the evidence that as a result of her work with defendant-employer, she has contracted a compensable occupational disease which is due to causes and conditions characteristic of and peculiar to her employment with defendant-employer, excluding all ordinary diseases of life to which the general public is equally exposed outside of their employment.
16. Plaintiff's de Quervain's tenosynovitis cleared up after a brief time with medication and apparently did not cause plaintiff to become disabled. However, the left thumb carpometacarpal joint arthritis did cause plaintiff to become incapable of earning pre-injury wages in any employment for a period of time.
17. As a consequence of plaintiff's disability arising from her occupational disease, plaintiff was temporarily totally disabled from January 4, 1996, through April 15, 1996, and was temporarily partially disabled from April 16, 1996 through May 14, 1996 when she worked four hours a day for two weeks and six hours a day for two weeks. Plaintiff has been capable of earning pre-injury wages since May 15, 1996.
18. At the time of becoming disabled from her occupational disease, plaintiff was earning an average weekly wage of $353.82, rendering a compensation rate of $235.88.
19. While the plaintiff received some disability compensation from a group plan which was partially funded by employee-paid premiums during the time she was out of work for treatment in 1996, the parties stipulated at the hearing before the Deputy Commissioner that no credit is being sought by the defendant for these payments.
 *********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. For a disability to be compensable under the North Carolina Workers' Compensation Act, it must be either the result of an accident arising out of and in the course of employment or an "occupational disease." Hansel v. Sherman Textiles,304 N.C. 44, at 51, 283 S.E.2d 101-106 (1981).
2. The plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires the plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101(1981), citing Booker v. Duke Medical Center,279 N.C. 458, at 468 and 475, 256 S.E.2d 189, at 196 and 200 (1979); and Moore v. J. P. Stevens and Co., 47 N.C. App. 744,269 S.E.2d 159 (1980).
3. To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage, only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. Booker v. Duke MedicalCenter, 297 N.C. at 472-75, 256 S.E.2d 189, at 198-200 (1979). Thus, the first two elements are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally.Id. "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation." Id. at 475, 256 S.E.2d at 200. Rutledge v. Tultex Corp.,308 N.C. 85, at 93-94, 301 S.E.2d 359 (1983).
4. Plaintiff has proven by the greater weight of the evidence that her employment with defendant either caused de Quervain's tenosynovitis and left thumb carpometacarpal joint arthritis, or significantly aggravated pre-existing conditions, and that her employment placed her at an increased risk of developing or aggravating these conditions than members of the general public. Plaintiff's occupational disease is therefore compensable. N.C. Gen. Stat. § 97-53(13).
5. As a result of her contraction of a compensable occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $235.88 per week from January 4, 1996 through April 16, 1996, and temporary partial disability compensation from April 16, 1996 through May 14, 1996 at varying rates equal to two-thirds (2/3rds) of the difference between her average weekly wage of $353.82 and the weekly wages she earned thereafter during said period.
6. As a result of her contraction of a compensable occupational disease, plaintiff is entitled to permanent partial disability compensation at the rate of $235.88 per week for thirty weeks for her 15% permanent partial disability rating for her left hand. N.C. Gen. Stat. §§ 97-53(13) and 31(12).
7. Plaintiff is entitled to receive all medical treatment reasonably required by her occupational disease which would tend to effectuate a cure, provide relief or lessen her disability. N.C. Gen. Stat. § 97-25.
 *********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to the attorney fee provided for below, for plaintiff's compensable occupational disease, defendant shall pay the plaintiff temporary total disability compensation at the rate of $235.88 per week from January 4, 1996, through April 15, 1996, and temporary partial compensation from April 16, 1996 through May 14, 1996 at varying rates equal to two-thirds of the difference between plaintiff's pre-injury average weekly wage of $352.82 and the weekly wages plaintiff actually earned during this period. The accrued amounts shall be paid in a lump sum.
2. As a result of her development of a compensable occupational disease, plaintiff is entitled to permanent partial disability compensation at the rate of $235.88 per week for thirty weeks for her 15% permanent partial disability rating for her left hand.
3. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under paragraphs one and two of this Award is hereby approved for plaintiff's counsel and shall be deducted from the sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay all medical expenses incurred or to be incurred in the future by the plaintiff as a result of her occupational disease for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen her disability when the bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
5. Defendant shall pay the costs, including the expert witness fee of $160.00 to E. Brown Crosby, M.D.
 S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _______________ LAURA K. MAVRETIC COMMISSIONER
S/ ________________ GEORGE GLENN DEPUTY COMMISSIONER